---

### Boots *et al.* v. Welles.

#### (*Circuit Court, N. D. Iowa, E. D.* April 16, 1890.)

BANKS AND BANKING—NATIONAL BANKS—INSOLVENCY.

The comptroller having notified a national bank that its capital was impaired, it was agreed that it might continue business on the directors putting in $100,000 in cash, and retiring that amount of objectionable securities. That sum was contributed; the account being opened with trustees appointed by the directors to manage the fund, with full power, as far as the bank was concerned, and to account therefor to the contributors in such manner as to protect the equities of each individual and the bank, in relation to the bank and its legal rights. It was understood between the trustees and the examiner that the securities to be retired were to be designated by the comptroller or examiner, but there was no such understanding with the comptroller. The full amount of objectionable securities had not been selected and given to the trustees when the bank was closed, the receiver taking and proceeding to collect the whole assets. *Held,* that the receiver was not required to account for the balance of the $100,000 as a special trust fund, but merely as a debt.

In Equity. Bill to enforce the proper application of an alleged trust fund.

*McCeney & O'Donnell, Henderson, Hurd, Daniels & Kiesel, Fouke & Lyon, J. H. Shields, R. W. Stewart,* and *Adams & Mathews,* for complainants.

*Wm. Graham,* for defendant.

SHIRAS, J. Upon the filing of the opinion of this court in the case of *Welles* v. *Stout,* reported in 38 Fed. Rep. 807, the present bill in equity was filed, in accordance with the suggestion therein made; and the question left undecided in that case is now presented for determination.

The evidence in this cause shows that the complainants herein contributed the sum of $100,000 to be used in restoring the solvency of the Commercial National Bank, which was placed in the bank; the account being opened upon the books in the names of J. K. Graves and John R. Waller, trustees. When the bank closed its doors, in March, 1888, the account showed a balance in favor of the trustees of $35,811.41, and it is claimed on behalf of complainants that this balance was held by the bank as a special or trust fund; that it did not form part of the assets of the bank; that the receiver is chargeable with notice of the nature of the

fund; that, when the receiver was placed in control of the bank, this balance came into his hands impressed with the trust originally pertaining thereto; and that he must account therefor to the complainants.

To properly determine the rights of the parties, it must be ascertained for what purpose and under what circumstances this fund of $100,000 was contributed by the complainants. The evidence shows that in 1887 the comptroller had notified the bank that its capital was impaired, and on the 1st day of July, 1887, he addressed a letter to the bank setting forth various items which it was claimed should not be counted in the statement of assets, and further notifying the bank that an assessment of 45 per cent. upon the capital stock had been ordered for the purpose of making good the losses enumerated. To avoid the necessity of making this assessment upon the stockholders, the directors assumed the raising of the sum named, the larger part of which was subsequently paid in. This contribution, however, proved insufficient to fully restore the impairment of the capital and standing of the bank; and on the 3d day of January, 1888, the comptroller again wrote to the bank, calling attention to the large amount of overdue and uncollected paper, and stating that—

"The relation between your bank and the Graves family interests are such as should not exist, and must not continue. I must respectfully insist either that the management of your bank be confined to the law, or that you give up the benefits and privileges of the national banking system. These loans are now reported to amount to $267,149. * * * The examiner reports that you contemplate putting $100,000 in cash into the bank during this month, and retiring an equal amount of objectionable securities. On this account, he recommends that you be granted the time mentioned in which to get the affairs of the bank in proper condition. In acting upon his suggestion, you are respectfully informed that I cannot allow such flagrant violation of law to continue, and you will be expected to use your best efforts to place the affairs of the bank in proper condition within that time."

To this letter the directors replied, under date of January 25, 1888, as follows:

"In reply to your letter of 3d inst., we would respectfully state that, of the $45,000 contributed, as advised you, July 11, '87, the sum of $30,000 has been paid in cash. The directors have, since the receipt of your letter, contributed $100,000 in cash, and as good paper as can be made to the bank, with which to retire objectionable securities; Mr. H. L. Stout acting for his son F. D. Stout in his absence. You will recall that it was our own suggestion, made to Examiner Stone, that we would contribute $100,000 to put the bank in sound condition, and much more than covers possible loss. * * *"

It further appears that, in carrying out the proposition for contributing the $100,000 for the purpose named, J. K. Graves and John R. Waller were selected to act as trustees in connection with said fund; and on the 24th of January, 1888, the following resolution was adopted by the directors:

"Resolved that, in carrying out the recommendations of the comptroller of the currency in contributing $100,000 to take up objectionable assets of this bank, Messrs. J. R. Waller and J. K. Graves are hereby appointed, jointly, to act as trustees in the handling and management of said $100,000 fund, with

full power, so far as this bank is concerned, according to their best judgment, and to account therefor to the parties contributing said fund as individuals in such manner as to protect the equities of each individual and the bank, in relation to the bank and its legal rights, and without other responsibility on their part than to act as their judgment dictates."

As already stated, the parties named deposited the $100,000 in the bank, and an account was opened with them as trustees. From the testimony of J. R. Waller and George A. Stone, the bank examiner, it would appear that, while there was no express agreement to that effect, it was understood that the objectionable securities to be retired were to be designated by the comptroller, or by the examiner in his stead. It thus appears that, as between the comptroller and the contributors of the fund, the understanding was that if, during the month of January, 1888, the sum of $100,000 should be contributed to put the bank in sound condition, there being retired, in place thereof, an equal amount of objectionable securities, the comptroller would not then put the bank into liquidation. As between the bank and the contributors to the fund, the agreement was that the retired securities should be held for the benefit of the contributors. But, as part of the objectionable securities was paper of some of the contributors, it was not intended that the retirement thereof should release the parties liable thereon; and hence, in the resolution of January 24th, the trustees were charged with the duty of protecting the equities and rights of the bank, and of the individual contributors. The trustees were thus charged with a double duty in regard to this matter. On the one hand, they were to appropriate the $100,000 to the purpose for which it was raised, according to the understanding between the comptroller and the directors; and, on the other, they were to receive and properly manage the retired paper according to the rights and equities existing between the bank and the individual contributors to the fund. The trustees, in fact, placed the $100,000 in the bank, and thereby performed their duty in that particular. The account was opened with them as trustees, but the mere form of the account did not affect or change the relation of the parties to the fund, or their rights therein. The money was placed in the bank for the purpose of strengthening it, according to the understanding with the comptroller, and thereby a further lease of corporate life was secured. In placing the money in the bank, the trustees did not make it a special deposit, nor in any manner restrict the use thereof by the bank. There was no agreement or understanding with the comptroller that he was to select out, and furnish to the contributors for their protection, any of the objectionable paper. The rights of the contributors in that regard grow out of the arrangement between the bank and the contributors, which it does not appear was ever made known to the comptroller. There is nothing, therefore, shown in the evidence, which justifies the conclusion that the fund went into the bank charged with any condition or trust whatever, so far as the comptroller was concerned, other than that it was a fund raised to strengthen the bank. As between the bank and the contributors, the latter had the right to demand the turning over to the trustees of the ob-

jectionable paper that was to be retired, to be by them managed for the protection of the parties contributing the fund.

Primarily the fund was contributed for the purpose of making good the impaired condition of the bank, and thereby securing the opportunity of continuing the business, instead of being forced into immediate liquidation. The payment into the bank would secure this lease of life; and when this payment was made, and the lease of life was secured, all control over the fund so contributed on part of the contributors or their trustees was at an end. The money became part of the assets of the bank, and was no longer subject to the control of the trustees. The bank did not receive the fund to be held in trust, but received it just as it would an assessment of an equal amount upon the stockholders; that is, as money paid in as part of the general capital of the bank. By the force, however of the agreement between the bank and the contributors, the latter were entitled to have delivered to the trustees named the objectionable paper that was retired to offset the fund contributed. This is a right and equity which the contributors have not lost, or been in any way deprived of. It is immaterial, in this respect, whether it was the duty of the bank officials or of the comptroller to select out and designate the particular paper to be retired. It appears from the evidence that some $54,804 of objectionable paper had been selected out and delivered to the trustees before the final closing up of the bank. When the bank closed its doors the trustees were entitled to receive some $35,000 in the objectionable paper. If, before the bank ceased its business, this amount in objectionable paper had been delivered to the trustees, the full duty of the bank to the contributors would have been performed. Having failed to deliver over this paper, the bank has not relieved itself from liability to account for the $35,000 contributed to it. The receiver having taken entire possession of the assets of the bank, and having proceeded with the collection thereof, it is now impossible to carry out the agreement with the contributors by delivering the full amount of the objectionable paper. This leaves the bank liable for the balance of the fund not thus accounted for, but this liability is in the nature of a debt. It cannot be construed to be a trust which reaches the fund itself as originally paid in. To so treat it would defeat, instead of effectuating, the purpose for which it was originally contributed. In effect, the only trust created was with relation to the objectionable paper, and this was not of such a nature as to prevent the bank from using the fund as part of the assets of the bank as soon as it was paid in; nor does it now entitle the complainants to charge the proceeds realized from the assets in the hands of the receiver with a trust, so as to claim a preferential right of payment therefrom over other creditors. It follows that complainants' bill must be dismissed, and it is so ordered.